786 F.2d 736
 UNITED STATES FIRE INSURANCE COMPANY, Plaintiff-Appellee,
v.
KENTUCKY TRUCK SALES, INC. (85-5243); Kimberly Thurman,
Individually and as Ancillary Administratrix of
the Estate of James F. Thurman
(85-5244); William J. McGuirk
(85-5290),
Defendants-
Appellants.
 Nos. 85-5243, 85-5244 and 85-5290.
 United States Court of Appeals,
Sixth Circuit.
 Argued Feb. 4, 1986.
Decided March 27, 1986.
 
 1
 Charles S. Cassis (argued), Susan C. Simpson, Brown, Todd & Heyburn, Louisville, Ky., for Kentucky Truck Sales, Inc.
 
 
 2
 William A. Miller (argued), Louisville, Ky., S. Anthony Long, Phillips & Long, Boonville, Ind., for Kimberly Thurman.
 
 
 3
 William S. Bowman (argued) Leslye Mercer Murray, Louisville, Ky., for U.S. Fire Ins. Co.
 
 
 4
 Before KEITH and GUY, Circuit Judges, and TAYLOR, District Judge.*
 
 
 5
 ANNA DIGGS TAYLOR, District Judge.
 
 
 6
 In this diversity case, appellants claim error in the District Court's conclusion that the insurer owed neither coverage nor a defense to the insured, and its entry of a declaratory judgment for the appellee insurer. We affirm.
 
 
 7
 United States Fire Insurance Company (hereinafter USFI) issued a standard garage liability insurance policy to Kentucky Truck Sales, Inc. and its President, William J. McGuirk, effective by its terms from April 1, 1982 to April 1, 1983. The policy insured McGuirk and his business up to certain limits for liability for personal injury and property damage arising out of garage operations, but included the following exclusion at Part IV, C(9):
 
 WE WILL NOT COVER--EXCLUSIONS:
 
 8
 9. Covered autos while used in any professional or organized racing or demolition contest or stunting activity.
 
 
 9
 The policy further provided that the insurer had no duty to defend "suits for bodily injury or property damage not covered by the policy."
 
 
 10
 The material facts are undisputed. Kentucky Truck was a Kentucky corporation dealing in sales of new and used semitractor trucks to the trucking industry. It did no trucking, itself. It was franchised by the Freight Liner and Volvo-White corporations to sell their semitractors, and offered service and repairs on new and used trucks at its garage. Kentucky Truck's semitractors were normally on the road only during a prospective purchaser's test drive, or during a post-repair road test by the service department. The company utilized three pickup trucks and four company cars for delivery of parts, service and sales, and only occasionally would utilize a used truck to haul heavy equipment or parts for internal use.
 
 
 11
 In March of 1983 Mr. Paul Young approached President McGuirk on behalf of Exhibit Management Associates, Inc., and asked if Kentucky Truck Sales would loan a semitractor truck to an event known as the Mid-America Truck Pull (or Mid-America Hot-Rod Pull) which was to be held in the coliseum ("Freedom Hall") of the Kentucky Fair and Exhibition Center, from March 25 through March 27, 1983. The loaned truck would be used as a tow-back truck. McGuirk agreed.
 
 
 12
 The Truck Pull was sponsored by three organizations, which shared equally in the proceeds. They were Exhibit Management Associates, Inc., the Kentucky State Fair Board, and the Kentucky Tractor Pull Association. Tickets for admission were sold to the public. The event consisted of a competition among trucks, by class (including hot rod tractors, a four wheel drive modified class, and a two wheel drive class), in pulling a weighted sled along a specially constructed dirt track, approximately 300 feet long and sixty feet wide. The winner of each class was the truck of that class which was able to pull the heaviest weight the greatest distance. Winners were awarded prize money and trophies.
 
 
 13
 The sled which was pulled by these trucks was operated by a rider who was able to increase or decrease its weight mechanically. All of the contestants performed consecutively, over the three days of the Pull, and all pulled the same sled on the same dirt track. This was made possible by utilization of the two-back truck which Mr. Young borrowed from Mr. McGuirk of Kentucky Truck. The tow-back truck pulled the sled back to the starting line, after each contestant truck had dragged it as far as possible down the track. At the direction of the starter, the tow-back truck placed the sled at the point along the starting line from which the next contestant must then drag it.
 
 
 14
 President McGuirk loaned a 1983 Autocar semitractor to the Truck Pull in exchange for the advertising value of announcements over the public address system that Kentucky Truck had lent it, program credits, and for the visibility of his vehicle on the track throughout the three day event where, according to his deposition, "several thousand people would get to see our product displayed out there." This was the first time that Kentucky Truck had ever loaned a vehicle to a Truck Pull.
 
 
 15
 When Mr. Billy Joe Miles, President of the Kentucky Tractor Pull Association and starter of this Pull, went to Kentucky Truck on March 25 to get the semitractor tow-back truck, he also recruited a Kentucky Truck employee, Floyd H. Marr, to drive the truck during the Saturday night and Sunday performances. Mr. Marr had never performed such a job before.
 
 
 16
 Marr was undisputedly instructed to drive the tow-back truck, in reverse, down the track behind the sled as each contestant pulled the sled. Then, when the contestant could pull no further and at the signal of the sled operator, he was to drag the sled as expeditiously as possible back to the starting line, for the next contestant. There appears to be a dispute of fact as to whether it was the usual practice for the tow-back truck to follow the sled as it progressed: but that is not a material fact, as the District Court properly held. It is undisputed that this was done on March 27, 1983, when the accident in litigation occurred. Miles, the starter and Association President, testified that it is essential that the tow-back truck move up the track with the sled, so that it can more expeditiously return the sled to the line, and each event will not become overly time-consuming.
 
 
 17
 The ambiance of the dirt track on which Floyd Marr and the Autocar semitractor were placed is also a matter of undisputed record. As the tow-back truck driver backed down the track, watching the sled operator from the rear-view mirror (as instructed) for the signal to tow back, the engine of the pulling vehicle generated enormous noise; its tires spun, spewing dirt and gouging holes into the track; it sometimes reared up onto its rear wheels, and on occasion its engine exploded. Although the speed of a vehicle's progress down the track was irrelevant to the competition, tire speed was a significant factor in the effort of the large vehicles to gain traction while pulling, and the faster a vehicle pulled, the further it was able to pull. The contestant vehicles were modified for this purpose and driven to maximum force.
 
 
 18
 Association President Miles testified that he held safety meetings before each event, and always cautioned the participants on safety because of the many dangers inherent to "any type of racing or any type of high performance." Safety rules required that participants' engines and transmissions be shielded by blankets, because explosions send engine metal into the air and into the ground.
 
 
 19
 In addition to the above circumstances, the tow-back driver operated amidst cheering spectators, and amidst the numerous people who either ran across the track between and among the contestant vehicle, the sled, and the tow-back truck, or who performed some function on the dirt track amidst the ongoing competition. Some graded dirt on the track; others were later contestants or their crews, inspecting the holes gouged in the track so that they might ask the starter to start their vehicle at a fresher point along the starting line. Throughout, Marr was to watch the starter for instructions as to placement of the sled at the starting line, and watch the sled operator, through the mirror, for the signal to return. The starter stood ready to motion the next truck up to the line, as soon as the tow-back had returned the sled.
 
 
 20
 On Sunday, March 27, 1983, Marr was driving the Autocar in reverse behind the sled (which was in turn being pulled by a contestant truck), approximately two-thirds from the start of the track. James F. Thurman, appellant Thurman's decedent, had rebuilt the semitractor which was scheduled to compete next, and was part of its crew. He walked onto the track between the sled and the Autocar tow-back truck. Marr was watching through the rearview mirror and Thurman was looking at the holes gouged in the track. Thurman was hit by the rear wheels, on the passenger side, and he died on May 1, 1983.
 
 
 21
 In October of 1983, decedent Thurman's widow, Kimberly, individually and as administratrix, filed suit against Kentucky Truck, Floyd Marr, and others in Jefferson County Kentucky Circuit Court for damages consequent upon the defendants' alleged negligence and Mr. Thurman's injury and death. On November 3, 1983, USFI (which had sent a timely reservation of rights letter) filed this declaratory judgment action in the Western District of Kentucky, seeking a determination of the questions whether the garage liability policy afforded coverage to Kentucky Truck and McGuirk for Thurman's claim, and whether USFI had a duty to defend Kentucky Truck and McGuirk against that claim. These three consolidated appeals have resulted from the District Court's determination of those questions by summary judgment in favor of the insurer and against appellants.
 
 
 22
 The appeal raises three questions. They are whether the Mid-America Truck Pull was a "stunting activity," within the meaning of the policy exclusion; whether the insured's Autocar semitractor was "used in" the activity; and whether Kentucky statutes invalidate the policy exclusion sought herein to be enforced.
 
 
 23
 In this diversity action, the law of the State of Kentucky must govern. Erie v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1937). It is settled Kentucky law that, if an insurance contract is susceptible of two constructions the court must adopt the construction most favorable to the insured. Wolford v. Wolford, 662 S.W.2d 835 (Ky.1984). It is equally settled, however, that the court must give all terms their plain meanings and not rewrite an insurance contract to enlarge the risk. Pierce v. West American Ins. Co., 655 S.W.2d 34 (Ky.App.1983).
 
 
 24
 The District Court referred to the Webster's New Collegiate Dictionary definition of the noun stunt, as "an unusual or difficult feat performed or undertaken chiefly to gain attention or publicity." This court notes that Webster's Third New International Dictionary places that definition secondary to "a feat or performance displaying notable strength or skill." We also note the approval given to judicial referral to Webster's for definition of such non-legal terms by Kentucky's then-highest court in Weaver v. National Fidelity Ins. Co., 377 S.W.2d 73 (Ky.App.1963). If the policy language "stunting activity" is to be given its plain meaning in accord with either of the above definitions, it cannot be gainsaid that the Mid-America Truck Pull was such an event, on the undisputed facts. Every contestant truck, driver, and crew clearly extended their capacities to the utmost in the competition, from the skillful rebuilding or modification of the vehicle, to the strategic selection of a relatively smooth route, to the skillful driving to gain traction and to execute the pull. Unusual and difficult feats were performed, notable strength and skill were displayed, and all for the attention of the assembled audience and for the recognition of trophies and prize money.
 
 
 25
 Appellants claim error in the District Court's precatory language to the effect that tractors are not manufactured for the purposes to which they were put, on this occasion. The District Court did not hold, however, that the exclusion applied because the activity was other than intended for tractors by manufacturers. It held the exclusion applicable because the event was a stunting activity.
 
 
 26
 Although this was a case of first impression in Kentucky law, the parties on both sides point to the Wisconsin Supreme Court's disposition of a similar issue in Garriguenc v. Love, 67 Wis.2d 130, 226 N.W.2d 414 (1975). In that case an injury at a demolition derby was held excluded as arising out of "automobile racing or stunting." That court, as did the District Court in this case, relied upon the ordinary meaning of the word stunt, as found in the dictionary, and noted that such an event involved increased risks to both participants and spectators. It found that the exclusion had been written with the intent to limit risks inherent in certain situations in which neither an automobile nor its owner or driver are usually expected to be found.
 
 
 27
 The undisputed facts here all militate to the conclusion that the Truck Pull was an occasion of extraordinarily increased risks to all persons and equipment present. The risk was most particularly enhanced for a dealership semitractor truck covered by the standard garage policy which USFI had issued to Kentucky Truck. This was indeed the degree of risk specifically excluded as a stunting activity. The policy is not ambiguous. There is no interpretation of the words "stunting activity" which is not synonymous with this enhancement of risk, and the danger of significant mishap, injury, or loss presented by the Truck Pull.
 
 
 28
 The District Court also correctly held that Kentucky Truck's Autocar semitractor was "used in" the stunting activity of the Truck Pull. The court referred to Webster's definition of "use" as "to put into action or service: avail oneself of," and found it clear on the undisputed facts that the tractor was used in the event, within the meaning of the policy exclusion.
 
 
 29
 Appellants argue that the vehicle was not a participant in the event, was not a competitor in the event, and that all vehicles "connected with" the event should not be excluded. None of those questions need be decided, however, because the Kentucky Truck vehicle was used in this stunting activity and was accordingly plainly excluded from policy coverage.
 
 
 30
 Finally, appellant Thurman argues that the Kentucky No-Fault statute, KRS 304.39-100(2) invalidates the exclusion because it abrogates the basic reparations benefits and minimum tort coverage required statutorily to be maintained. That law does require certification by every insurer doing business within the Commonwealth that any motor vehicle contract which it issues shall be deemed to provide the basic reparations benefits of $10,000 and minimum tort security of $10,000 required by law. The law does not require, however, that those benefits be paid under circumstances in which there is no contractual coverage or obligation. This argument is, in essence, that no exclusions are permitted from an automobile liability insurance contract in Kentucky.
 
 
 31
 The District Court correctly held that the case cited by appellants of Bishop v. Allstate Ins. Co., 623 S.W.2d 865 (Ky.1981), is inapposite. It is not one in which the insurer had denied coverage as here, but had attempted to deny reparations benefits to one passenger in a covered vehicle.
 
 
 32
 The judgment of the Honorable Thomas A. Ballantine, Jr., is therefore affirmed.
 
 
 
 *
 Honorable Anna Diggs Taylor, United States District Judge for the Eastern District of Michigan, sitting by designation