TOWN OF WESTPORT *v.* CONNECTICUT SITING
COUNCIL ET AL.

CELLCO PARTNERSHIP *v.* ZONING BOARD
OF APPEALS OF THE TOWN OF
WESTPORT ET AL.

| Superior Court | Judicial District of | File Nos. CV00-0501129S |
| | New Britain | CV00-0500547S |

Memorandum filed June 27, 2001*

*Wake, See, Dimes & Bryniczka,* for the plaintiff in the first case and the named defendant in the second case.

*Robert S. Golden, Jr.,* and *Mark F. Kohler,* assistant attorneys general, with whom was *Richard Blumenthal,* attorney general, for the named defendant in the first case.

*Robinson & Cole,* for the plaintiff in the second case.

COHN, J. These are consolidated appeals. In Docket No. CV00-0501129S, the plaintiff, the town of Westport (town), appeals from a December 17, 1998 decision of the named defendant, the Connecticut siting council (council), approving an application for a certificate of environmental compatibility and public need for the construction and operation of a telecommunications tower facility proposed by Cellco Partnership, doing

---

* Affirmed. *Westport* v. *Connecticut Siting Council,* 260 Conn. 266, 796 A.2d 510 (2002).

business as Bell Atlantic Mobile. In Docket No. CV00-0500547S, the plaintiff, Cellco Partnership (Cellco), appeals from a July 27, 1999 decision of the named defendant, the zoning board of appeals of the town of Westport (board), upholding its zoning enforcement officer's refusal to approve Cellco's zoning application to construct the tower facility. The first appeal is brought pursuant to General Statutes § 16-50q and § 4-183, of the Uniform Administrative Procedure Act (UAPA). The second appeal is brought pursuant to General Statutes §§ 8-8 and 8-10. The court decides for the council on the town's appeal, Docket No. CV00-0501129S, and for Cellco on its appeal, Docket No. CV00-0500547S, for the reasons stated subsequently in this opinion.

The council, in its final decision of December 17, 1998, made findings of fact that may be summarized as follows.

1. Cellco applied to the council on June 24, 1998, pursuant to General Statutes §§ 16-50g through 16-50aa, for a certificate of environmental compatibility and public need for construction, operation and maintenance of a cellular telecommunications facility in the town. A "prime site" on 2 Sunny Lane and an alternate site near the intersection of Clinton Avenue and the Merritt Parkway were identified. The purpose of the proposed facility was to provide cellular coverage for existing coverage gaps in the area and to meet demand beyond the capacity of existing facilities.

2. Notice was given and hearings were held pursuant to General Statutes § 16-50m. The council and its staff made inspections of the proposed prime and alternative sites. During the field inspection, Cellco flew a balloon at each of the proposed sites to simulate the heights of the towers proposed at the two locations.

3. Springwich Cellular Limited Partnership (Springwich), the Southern New England Telephone cellular affiliate, Sprint Spectrum (Sprint), a personal

communications service provider (pcs provider), Omnipoint Communications, Inc., (Omnipoint), a pcs provider, and Nextel Communications of the Mid-Atlantic, Inc., doing business as Nextel Communications (Nextel), an enhanced specialized mobile radio service provider, sought to share the proposed tower, equipment building, generator and associated fuel tank at both of the proposed sites.

4. Cellco has offered to provide space on the proposed tower to the town's public safety entities.

5. Existing Cellco facilities in the towns of Westport, Fairfield and Norwalk do not provide adequate service for coverage gaps in the northern Westport area. The primary purpose of the proposed site is to provide coverage to these gaps and additional traffic handling capacity along Routes 33, 53, 57, 136 and 15.

6. Springwich also has gaps under existing coverage. Omnipoint has limited coverage in the northern portion of the town and coverage gaps in excess of five miles along Route 15.

7. Sprint experiences a coverage gap of approximately 3.5 miles along Route 15 and lesser distances on other routes.

8. Nextel experiences a coverage gap of approximately 4.5 miles along Route 15 and lesser distances on other routes.

9. Other suggested sites were investigated, but did not prove feasible. The sites were rejected for such reasons as an unwillingness of the property owner to lease land, system performance problems, less favorable channel deployment and insufficient coverage. One site suggested by the town was the department of transportation (department) commuter parking lot off of exit 41 of the Merritt Parkway.

10. Cellco met with town officials in August, 1997, and, in June, 1998, participated in a public hearing.

11. The town does not support the placement of a telecommunications facility at either of the proposed sites. The town has stated that the proposed facilities are commercial in nature, are not appropriate in residentially zoned areas and are inconsistent with the town's plan of development.

12. The town made recommendations to the council, should it approve the prime site, to protect water resources at or near the site, including Poplar Plains Brook. It made similar environmental recommendations for the alternative site.

13. The town suggested, as an alternative to either site, expanding the current 180 Bayberry Lane facility by devoting more town land to the site.

14. The proposed prime site is a 1.63 acre parcel located at 2 Sunny Lane in Westport and is owned by Cellco. It is in a town residence AAA district for single-family homes. According to town zoning regulations, communication towers are allowed with a special permit and site plan approval on ten acre parcels.

15. The proposed prime site is a developed parcel consisting of a single-family building, an approximately twelve foot wide driveway, maintained lawn and landscaped trees and shrubs. The existing single-family building is the only structure within 160 feet of the base of the proposed tower.

16. The proposed prime site is traversed by the Poplar Plains Brook and contains inland wetlands and a 100 year flood zone located adjacent to the brook. The proposed prime site tower compound would be located no closer than approximately 75, 110 and 55 feet from the areas designated as a watercourse, inland wetland and 100 year flood zone, respectively.

17. Cellco proposed to construct a 160 foot monopole tower, enclosed by an eight foot tall security fence with a gate, on an approximately forty foot compound at the proposed prime site. There would be a variety of antennas placed on the tower by the shared users.

18. Vehicular access would be from Sunny Lane along the existing driveway. Utility service would extend from the existing service along Sunny Lane underground for a distance of approximately 170 feet to the building.

19. All the electrical equipment and a 200 kilowatt emergency generator, sized to accommodate five tower users, would be installed within the existing single-family structure on the proposed site.

20. The proposed prime site is surrounded by existing residential development and the Merritt Parkway. There are approximately twenty-two residences within 1000 feet of the proposed site.

21. The proposed site is located approximately fifty feet south of the Merritt Parkway right of way, near the commuter parking area located adjacent to inter-change 41 off the Merritt Parkway.

22. The proposed prime site would require the removal of three trees of less than four inches in diame-ter, but five trees with diameters of twenty-four inches or greater would be spared.

23. The cost of construction of the prime site was placed at $1,404,000.

24. The alternative site is a 1.238 acre parcel south of the intersection of the Merritt Parkway and Clinton Avenue. It is in a residence A district, allowing for single-family residences and communication towers with spe-cial permit.

25. The proposed alternative site is an undeveloped parcel containing mature deciduous trees. It does not

contain watercourses, inland wetlands, or a 100 year flood zone. A wetlands area is located on an adjacent parcel.

26. The alternative site would contain a 180 foot monopole tower, a single-story twelve foot wide L-shaped equipment building, with approximately 1200 square feet of area for four of the five carriers' equipment and the proposed generator, and two concrete pads for the fuel tank and Omnipoint's equipment cabinets, within an approximately sixty foot by eighty-eight foot fenced compound.

27. The carriers would utilize the same antennas at the proposed alternative site as at the proposed prime site.

28. Vehicular access to the proposed tower compound would extend from Clinton Avenue along a proposed twelve foot wide gravel driveway. Utility service would extend underground from existing service along Clinton Avenue a distance of approximately 260 feet to the proposed alternative site compound.

29. The site is surrounded by woodlands, residential development and the Merritt Parkway. There are approximately seventy-nine residences within 1000 feet of the proposed site.

30. Development of the proposed alternative site would require the removal of approximately twenty-four trees, twenty-four inches or greater in diameter. Approximately thirty-four cubic yards of cut material would be generated and ninety-eight cubic yards of fill material would be required for the construction of the proposed alternate site.

31. The approximate cost of the construction for the alternative site would be $1,334,000.

32. There are no known existing populations of federal or state endangered species occurring at the proposed prime or alternative sites.

33. Development of the proposed prime site would involve minimal land disturbance and would not substantially alter the character of the natural resources including wetlands and watercourses, vegetative composition and wildlife habitats. Development of the proposed alternative site would result in an incremental loss of wildlife habitat, lessen the visual screening from the Merritt Parkway and impair the open space aspect of the site.

34. The state historic preservation office states that a 160 foot tower located within the Merritt Parkway right-of-way would constitute an incompatible and irreparable alteration of the historic landscape design and scenic character of the Merritt Parkway.

35. The town's historical district commission stated that the proposed towers would adversely effect the historic and scenic character of the Merritt Parkway.

36. The Samuel Morehouse residence is located 600 feet north of the proposed alternative site and has been placed by the town on a historic resource survey.

37. The proposed prime and alternative sites are underlain by the Saugatuck River aquifer; however, both sites are not located in the draw down area of public water supply wells.

38. Postconstruction noise generated at the proposed sites would consist of the operation of the heating, air conditioning and ventilation systems and the back-up emergency generator.

39. Finally, the findings of fact set forth statistical data for the following matters: electromagnetic radio frequency power densities for the prime and alternative

sites; the visibility from various locations of the prime and alternative sites; and, proposed coverage for Cellco's and the other shared users' antennas at both sites and other less prime sites.

Based on the aforementioned findings of fact, the council concluded that it had jurisdiction over the proposed facility because it would be "used in a cellular system" within the meaning of General Statutes § 16-50i (a) (6). It found that Cellco's and the other shared users' existing facilities in the area do not provide adequate coverage or capacity in the northern Westport area. The sharing of the tower was consistent with state law and policy promoting shared use.

The council found that the prime site at Sunny Lane was preferable to the alternative site. There were fewer homes in a 1000 foot radius than the proposed alternative site, and the Sunny Lane site would be near a location recommended by the town as an alternative site for the development of a facility (the aforementioned department commuter parking lot). Development of the proposed alternative site would result in an incremental loss of wildlife habitat, lessen the visual screening from the Merritt Parkway, require the removal of a substantial number of mature deciduous trees and impair the open space aspects of the site.

There were no environmental constraints at the Sunny Lane site. The project would involve minimal land disturbance and would not substantially alter the character of the natural resources including wetlands and watercourses, vegetative composition and wildlife habitats. The town had raised concerns regarding Poplar Plains Brook and the wetlands at the site. This would be resolved by adjusting the location of the tower away from the inland wetlands and watercourses. The council did find the tower at a proposed height of 160 feet might impact the existing residential land use and be visible to

motorists on the Merritt Parkway. The council resolved this issue by restricting the tower to a height of 130 feet and suggesting that an existing tower, operated in conjunction with the new tower, would ensure coverage.

In its accompanying order, the council approved the application of Cellco for a certificate of environmental compatibility and public need for the construction, operation and maintenance of the telecommunications tower at the Sunny Lane site, under certain conditions. The following three conditions were included.

First, the tower was to be constructed as a monopole, sufficient to accommodate the antennas of Cellco, Springwich, Sprint, Omnipoint and Nextel, and is not to exceed 130 feet.

Second, Cellco was to prepare a "Development and Management Plan" for the site, under the regulations of the council, to be submitted for review by the council.

Third, and finally, Cellco was to take the site development and construction actions as set forth in the foregoing opinion of the council and in the recommendations of the town.

In Docket No. CV00-0501129S, the town appealed from this final decision.[1] In the meanwhile, Cellco applied for a building permit from the town for the certified facility. The town's zoning enforcement officer refused to issue an opinion of zoning compliance which was needed to obtain the building permit. Cellco appealed that refusal to the board. On July 28, 1999, the chairman of the board informed Cellco that "at the work session held by the Zoning Board of Appeals on July 27, 1999, the Board voted 5-0 . . . to DENY your request for Appeal . . . from the denial of a zoning

---

[1] Whether the town is aggrieved by this final decision is discussed subsequently in this opinion.

permit for construction of a wireless telecommunications facility approved by the [council] . . . in a Res. AAA zone. . . ." "This Appeal was denied and the Planning and Zoning Director's decision was upheld since the Board determined that the decision not to issue a zoning permit was an appropriate action." Cellco has appealed in Docket No. CV00-0500547S from this decision.[2]

Initially, the court considers the contention made by Cellco that the appeal taken by the town, Docket No. CV00-0501129S, should be dismissed on the jurisdictional ground of lack of aggrievement. "[T]he fundamental test for determining aggrievement encompasses a well-settled twofold determination: first, the party claiming aggrievement must successfully demonstrate a specific personal and legal interest in the subject matter of the decision, as distinguished from a general interest, such as is the concern of all members of the community as a whole. Second, the party claiming aggrievement must successfully establish that this specific personal and legal interest has been specially and injuriously affected by the decision . . . . Aggrievement is established if there is a possibility, as distinguished from a certainty, that some legally protected interest . . . has been adversely affected." (Internal quotation marks omitted.) *New England Cable Television Assn., Inc.* v. *Dept. of Public Utility Control*, 247 Conn. 95, 103, 717 A.2d 1276 (1998); see also *Bethlehem Christian Fellowship, Inc.* v. *Planning & Zoning Commission*, 58 Conn. App. 441, 447, 755 A.2d 249 (2000) ("[s]tanding is not a technical rule intended to keep aggrieved parties out of court; nor is it a test of substantive rights" [internal quotation marks omitted]).

---

[2] At the hearing of November 21, 2000, Cellco introduced a deed to the Sunny Lane premises and other uncontroverted evidence indicating that it is the owner of the premises and that the ruling of the board was injurious to its interest. Aggrievement, therefore, is found. *Gregorio* v. *Zoning Board of Appeals*, 155 Conn. 422, 426, 232 A.2d 330 (1967).

Three witnesses testified at the November 21, 2000 hearing in support of the town's claim of aggrievement. The first witness was the acting conservation director for the town. She stated that the council in the final decision did not adequately consider the various environmental and conservation issues under her jurisdiction. The second witness was the director of planning and zoning for the town. She testified that the final decision of the council violated the zoning laws of the town, particularly in that the approved tower would have a "mixed use." The final witness was the first selectman of the town. She testified that she was responsible under the town's charter to execute the laws and ordinances of the town faithfully, and to supervise the conservation director and planning and zoning director.

On the first requirement of aggrievement (specific personal and legal interest), there is precedent that "[a]s the representative of the public interests of all its inhabitants, the plaintiff is an aggrieved person . . . ." *Milford* v. *Commissioner of Motor Vehicles*, 139 Conn. 677, 681, 96 A.2d 806 (1953); *Guilford* v. *Landon*, 146 Conn. 178, 179–80, 148 A.2d 551 (1959). "It is the court's finding that the plaintiffs have a specific personal and legal interest in the subject matter of the defendant's decision granting the modified site plan application. The Town of Cromwell is legally required to enforce the provisions of the Inland Wetlands and Watercourses Act. . . . Clearly, the regulated activities which the defendant approved affect wetlands and watercourses which are located in both the city of Middletown and the town of Cromwell. It follows that the town has a specific legal interest which has been affected by the defendant's decision, and the plaintiffs are aggrieved by it." *Cromwell* v. *Inland Wetlands & Watercourses Agency*, Superior Court, judicial district of Middlesex at Middletown, Docket No. 65192 (September 15, 1993)

(10 Conn. L. Rptr. 92, 93–94) (*Gaffney, J.*). Here, the town's three witnesses demonstrated that town officers had environmental, planning and zoning interests in the siting of the tower and that the town was obliged to ensure that these interests were pursued.

The second aggrievement requirement (interest injuriously affected), is more difficult for the town to satisfy. Under General Statutes § 16-50x (a), the council has exclusive jurisdiction over the siting of a telecommunications tower. *Preston* v. *Connecticut Siting Council,* 20 Conn. App. 474, 483, 568 A.2d 799, cert. denied, 214 Conn. 803, 573 A.2d 816 (1990). Section 16-50x (a) further provides that the council "shall give such consideration to other state laws and municipal regulations as it shall deem appropriate." It has been held under § 16-50x (a) that the plaintiff town, since it has no direct role in the siting process, "failed to demonstrate how any interest it may have has been specially and adversely affected by the council's decision." *East Hartford* v. *Connecticut Siting Council,* Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. CV91-0503484S (November 5, 1993) (*Barry, J.*).

In the present case, however, the town argues that the council has in its final decision permitted both cellular and noncellular providers to make use of the tower. The town claims an error in that the council's jurisdiction does not extend to allowing this "mixed use." Under the town's theory, a mixed use situation still allows the town to apply its local laws and ordinances; as the final decision of the council interferes with the town's rights, it is injured in fact. This assertion, under the standard that standing exists if there is a possibility that legal interests may be affected, is sufficient for the court to find that the town has satisfied this second requirement of aggrievement.

The court must now consider the merits of the issues raised in these consolidated appeals. The first issue in both appeals is that of the exclusive jurisdiction of the council. When the issue was initially briefed, it was assumed, based on a declaratory ruling of the council, that it had no jurisdiction over towers used only for personal communications services systems. Subsequently, just one day before argument in the present cases, the United States District Court ruled that the council did have jurisdiction over personal communications services as well as cellular systems. *Sprint Spectrum LP* v. *Connecticut Siting Council,* United States District Court, Case No. 3-98-cv-33 (November 20, 2000, Covello, J.), appeal pending 01-17127 (United States Court of Appeals, Second Circuit) (*Sprint Spectrum*).

The parties have further briefed the effect of *Sprint Spectrum* on the cases before the court. Cellco argues that the District Court's decision resolves the jurisdictional issue here, while the other parties resist application of the decision. *Sprint Spectrum* was appealed on January 22, 2001, and is still pending in the Second Circuit Court of Appeals.** In addition, this court is not bound to follow a District Court's interpretation of state law. *Anderson* v. *Ludgin,* 175 Conn. 545, 551 n.6, 400 A.2d 712 (1978). The court, therefore, will consider the matter without relying on the holding in *Sprint Spectrum.*

In its first issue, the town argues that, given that the tower will have both cellular and noncellular attachments, the town, in addition to the council, retains jurisdiction and may enforce its municipal codes. From this, the town claims in its appeal that the council erred in

** Since the time Judge Cohn issued his decision in the present case, the Second Circuit Court of Appeals reached its decision in *Sprint Spectrum LP* v. *Connecticut Siting Council,* 274 F.3d 674 (2d Cir. 2001), which affirmed the judgment of the District Court.

asserting its exclusive authority in locating the tower, and, in Cellco's appeal, that the board was correct in denying the building permit.

Under the provisions of § 16-50x (a), the council has "exclusive jurisdiction over the location and type" of certain statutorily defined facilities. "Facility" is defined by § 16-50i (a) (6) to include "such telecommunication towers, including associated telecommunications equipment . . . *used in a cellular system*, as defined in the Code of Federal Regulations Title 47, Part 22, as amended . . . ."[3] (Emphasis added.) Thus, the question becomes whether the legislature, in employing the phrase "used in a cellular system," intended to give the council exclusive jurisdiction over telecommunications towers that not only are to be developed for use by a cellular carrier, but also have noncellular equipment thereon.

"[I]n construing any statute . . . we seek to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter."

---

[3] As stated in *Nobs* v. *Connecticut Siting Council*, Superior Court, judicial district of New Britain, Docket No. CV98-0492714S (April 28, 2000) (*McWeeny, J.*): "Wireless telephones work by transmitting a low power signal between a wireless telephone and a personal wireless facility, commonly known as a 'cell site,' which consists of antennas mounted on a tower, tall building or similar tall structure. Radio frequency principles and network design require a number of cell sites. The network functions by having the caller signal 'handed off' to a cell site in an adjacent area as it moves out of coverage of a cell site, with a goal of providing seamless and continuous mobile telephone service throughout the wireless service providers' licensed area." The noncellular equipment is attached to these cellular towers so that the separate type of wireless communication may also function seamlessly and continuously.

(Internal quotation marks omitted.) *Oxford Tire Supply, Inc.* v. *Commissioner of Revenue Services*, 253 Conn. 683, 690, 755 A.2d 850 (2000).

The court must turn first to the statutory language "used in a cellular system" itself. *In re Baby Z.*, 247 Conn. 474, 498, 724 A.2d 1035 (1999). In the absence of a statutory definition of a term, the term should be given its common meaning as reflected in sources such as dictionaries. *Hartford Hospital* v. *Dept. of Consumer Protection*, 243 Conn. 709, 716–17, 707 A.2d 713 (1998); General Statutes § 1-1 (a). The dictionary definition of the word "use" is "to put into action or service." Webster's Third New International Dictionary (1966).[4] The common meaning of "used in a cellular system," as it affects the council's jurisdiction, encompasses not only the approved cellular providers, Cellco and Springwich, but also the personal communications services and enhanced specialized mobile radio service carriers that are "putting their non-cellular equipment into action" on the cellular tower.

*United States Fire Ins. Co.* v. *Kentucky Truck Sales, Inc.*, 786 F.2d 736 (6th Cir. 1986), concerned a similar definitional issue. In that case, an insurance policy excluded coverage of "autos while used in any professional or organized racing or demolition contest or stunting activity." Id., 737. At a Kentucky fair, at which there was stunting activity, a death occurred when a truck used to tow racing cars struck a spectator. A declaratory judgment action raised the issue of whether the truck was " 'used in' " the stunting so that there would be no insurance coverage for the incident. Id., 739. The United States Court of Appeals for the Sixth Circuit quoted from the same dictionary definition set

---

[4] See also Black's Law Dictionary (6th Ed. 1990), defining "use" as follows: "To put or bring into action or service . . . *Beggs* v. *Texas Dept. of Mental Health and Mental Retardation*, [496 S.W.2d 252, 254 (Tex. App. 1973)]."

forth previously: "The District Court also correctly held that Kentucky Truck's Autocar semitractor was 'used in' the stunting activity of the Truck Pull. The court referred to Webster's definition of 'use' as 'to put into action or service: avail oneself of,' and found it clear on the undisputed facts that the tractor was used in the event, within the meaning of the policy exclusion. Appellants argue that the vehicle was not a participant in the event, was not a competitor in the event, and that all vehicles 'connected with' the event should not be excluded. None of those questions need be decided, however, because the Kentucky Truck vehicle was *used in* this stunting activity and was accordingly plainly excluded from policy coverage." (Emphasis in original.) Id., 740.

*United States Fire Ins. Co.* is a clear indication that the phrase "used in" is not as narrow in meaning as the town contends. See also *Mills* v. *Colonial Penn Ins. Co.*, 47 Conn. Sup. 17, 27, 768 A.2d 1 (2001) (" 'use of the automobile was *in some way* "connected with" the accident' " [emphasis in original]). The court concludes that the council's jurisdiction is broad enough to cover noncellular equipment placed on a cellular tower.

The legislative history of the phrase is also instructive. Public Acts 1984, No. 84-249, added subdivision (6) to the definitions of § 16-50i (a). The act as initially passed in the Senate gave the council exclusive jurisdiction to regulate telecommunications towers used for public cellular radio communication services. 27 S. Proc., Pt. 3, 1984 Sess., p. 842, remarks of Senator John B. Larson. In the House proceedings, Representative David Lavine first generally pointed out that the purpose of the legislation was to end ad hoc town by town regulation in favor of regulation by the council. 27 H.R. Proc., Pt. 9, 1984 Sess., pp. 3206-11. He also introduced an amendment that changed the Senate language to the current "used in a cellular system" terminology with a

reference to the federal definition of a cellular system. Id., pp. 3206–11, especially pp. 3209–10. The Senate later joined in the bill as amended in the House. Public Act 84-249 as enacted thus contains broader language than as initially proposed.

Moreover, "[s]tatutes are to be construed in a manner that will not thwart [their] intended purpose . . . ." (Internal quotation marks omitted.) *Commission on Human Rights & Opportunities* v. *Sullivan Associates*, 250 Conn. 763, 778, 739 A.2d 238 (1999). If there are two possible interpretations of a statute, the court should adopt the more reasonable construction and review the statute as a whole. *Ferrigno* v. *Cromwell Development Associates*, 244 Conn. 189, 202, 708 A.2d 1371 (1998).

Here, Cellco put forth in its application a use of the tower that included sharing the facility with another cellular carrier and three noncellular carriers, and the council agreed by ordering this sharing. These additional users, according to the council, "have been unable to identify existing facilities that would improve their respective coverage and consequently seek to share the proposed tower."

Such action by the council is in keeping with clear direction from the General Assembly. In § 16-50g, the legislature states that one of the purposes of the Public Utility Environmental Standards Act (PUESA) is "to promote the sharing of towers for fair consideration wherever technically, legally, environmentally and economically feasible to avoid the unnecessary proliferation of towers in the state . . . ."

When the application was presented to the council, it had the duty to investigate the feasibility of whether Cellco might use an existing tower. As Judge McWeeny stated in *Nobs* v. *Connecticut Siting Council*, Superior

Court, judicial district of New Britain, Docket No. CV98-0492714S (April 28, 2000): "The sharing of the facilities is encouraged if not required by General Statutes § 16-50p (b) (1) (A)."

In granting a certificate to Cellco, the council was also obliged to examine whether a tower to be constructed might be shared with "*any* public or private entity which provides telecommunications . . . service to the public . . . ." (Emphasis added.) General Statutes § 16-50p (b) (1) (B). Under § 16-50p (b) (2), the council is authorized to impose tower sharing as part of its locational order. These statutes do not limit the scope of the duty to investigate the sharing of towers, or the council's ultimate requirements regarding sharing, to cellular providers only.[5]

It is only reasonable to conclude that the council's order that Cellco share its tower with noncellular carriers is in furtherance of the legislative purpose. To hold that the exclusive jurisdiction of the council is destroyed through this sharing process would frustrate the goals of the legislature and is not a rational result. Such a claim is merely a subset of the argument made by the town in *Preston* v. *Connecticut Siting Council,* supra, 20 Conn. App. 482–83, that a planning and zoning commission had jurisdiction to review an application to the council for a certificate. The Appellate Court called this argument an "erroneous hypothesis." Id., 482.[6] The court, therefore, rejects the town's jurisdictional argument.

---

[5] In 1993, the legislature also added General Statutes § 16-50aa (b), which sets forth a definition for existing towers. The argument cannot be made, however, that because the legislature did not change, at that time, the phrase "used in a cellular system," that it intended to affect the council's jurisdiction over towers with cellular and noncellular equipment. See 36 H.R. Proc., Pt. 20, 1993 Sess., p. 6997, remarks of Representative John W. Fonfara.

[6] As seen in the aforementioned legislative history, the town's home rule argument was rejected in the passage of PUESA. There is no reason why the council cannot reject any application from a provider that appears to be a subterfuge; that is, a cellular provider deliberately seeks approval from

The court now considers the town's argument in its appeal that the council's actions were both procedurally and substantively illegal. The standard of review of the town's claim "is highly deferential. . . . Ordinarily, this court affords deference to the construction of a statute applied by the administrative agency empowered by law to carry out the statute's purposes. . . . [A]n agency's factual and discretionary determinations are to be accorded considerable weight by the courts." (Citations omitted; internal quotation marks omitted.) *Bezzini* v. *Dept. of Social Services*, 49 Conn. App. 432, 436, 715 A.2d 791 (1998).

Section 16-50p of PUESA sets forth the criteria for council decisions and certificate proceedings such as are at issue in the present case: "[T]he council shall not grant a certificate . . . unless it shall find and determine: (1) A public need for the facility and the basis of the need; (2) the nature of the probable environmental impact, including a specification of every significant adverse effect, whether alone or cumulatively with other effects, on, and conflict with the policies of the state concerning, the natural environment, ecological balance, public health and safety, scenic, historic and recreational values, forests and parks, air and water purity and fish and wildlife; (3) why the adverse effects or conflicts referred to in subdivision (2) of this subsection are not sufficient reason to deny the application . . . ."

The court's "review of an agency's factual determination is constrained by . . . § 4-183 (j), which mandates that a court shall not substitute its judgment for that

the council only so that a noncellular provider might share the tower. Finally, it is legally insignificant that the council has decided not to take direct jurisdiction over noncellular carriers. As indicated previously, the council's jurisdiction over telecommunications towers "used in a cellular system" would extend to the noncellular carrier equipment on a cellular tower.

of the agency as to the weight of the evidence on questions of fact. The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are . . . (5) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record . . . . This limited standard of review dictates that, [w]ith regard to questions of fact, it is neither the function of the trial court . . . to retry the case or to substitute its judgment for that of the administrative agency. . . . An agency's factual determination must be sustained if it is reasonably supported by substantial evidence in the record taken as a whole. . . . Substantial evidence exists if the administrative record affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . This substantial evidence standard is highly deferential and permits less judicial scrutiny than a clearly erroneous or weight of the evidence standard of review. . . . The burden is on the plaintiffs to demonstrate that the [agency's] factual conclusions were not supported by the weight of substantial evidence on the whole record." (Citations omitted; internal quotation marks omitted.) *New England Cable Television Assn., Inc.* v. *Dept. of Public Utility Control*, 247 Conn. 95, 117–18, 717 A.2d 1276 (1998).

The town initially raises a procedural defect in the proceedings, alleged to have been committed by the council's chairman. During the hearing of September 28, 1998, an attorney for the residents of Sunny Lane asked a witness for Cellco whether she had submitted applications to local agencies of the town for permit approval. When the residents' attorney sought to follow up on this question, Cellco's attorney objected. The residents' attorney then stated: "And what I don't want to have happen here . . . I don't want this application to be evaluated by the [council] and approved . . . and

then a site development plan presented which is differ-
ent than the one you're looking at. Now, if this doesn't
comply with local zoning, we ought to know that now.
It's a central issue in this application. And there's been
no attempt to demonstrate that it does comply. . . . I
would like to have those questions resolved at this
time."

At this point, the chairman, who had previously stated
that "when [the council] gives permission for that site
to be built, when they do the development and manage-
ment plan, they have to conform to all the local regula-
tions," indicated as follows: "For a long time we
required all these nuts and bolts to come before the
council before we made a decision. And when we turned
down an application, those nuts and bolts really [were
not] necessary and they went through a lot of work.
Now we take the basis of an application, we go through
and look at it as carefully as we can. And based upon
our considered judgment of everybody involved, we
grant them this application. And [when] we grant this
[application] with certain provisions . . . they have to
come before us with what we call a development and
management plan. And all those things that are critical
to the environment, that we believe critical to the envi-
ronment, the Connecticut Soil and Erosion Guidelines
and all the rest of it, have to conform in order for them
to get a plan so they can build a site. That's the reason
we don't ask them for all the nuts and bolts before we
grant the application. But they do have to give us all
the nuts and bolts when they give us the development
and management plan to build on this site."

The residents' attorney stated that, "[Y]ou're wrong
in doing it that way. I think that it violates the statute.
I think that it violates the spirit of the law and the letter
of the law." At this point, the assistant attorney general
stated: "Mr. Chairman, just to try to get back on track,

I think that the question that was originally posed . . . should be answered by the applicant." The chairman stated that the question on submission to the zoning authorities of the town should be answered "right now." The question was answered, as were further follow-up questions.

From this exchange, the town argues that the chairman of the council, in discussing the procedure to be followed at the hearing, ruled out the presentation of evidence of the town's concerns until after the decision on location was made. Even if the remarks of the chairman can be read in this manner,[7] the fact is that the question on zoning, and numerous additional questions, were answered as sought by the residents' attorney. The record before the council contains testimony and exhibits from which the council could gather local regulatory concerns, including zoning issues. In addition, the three documents issued by the council, the findings of fact, the opinion, and the decision and order, each consider the town's concerns.

The council recognized the town's concerns regarding the Poplar Plains Brook, and the factors encompassing environmental and residential objections in the designation of the site. In its decision and order, the council conditioned its approval of the application on Cellco's compliance with the town's recommendations, including abandonment of the septic system, planting of dense vegetation and relocation of the fuel tank.

In order to show that the chairman's remarks, if interpreted as claimed by the town, justify this court in taking action to set aside the council's decision, the town must show prejudice. *Griffin* v. *Muzio*, 10 Conn. App. 90, 94, 521 A.2d 607, cert. denied, 203 Conn. 805,

---

[7] It is equally possible to understand the chairman to be indicating that specific detail in the local regulations only comes into consideration in the management and development plan.

525 A.2d 520 (1987) (claim of erroneous exclusion of evidence requires showing of substantial prejudice). This record does not support such a finding of prejudice in light of the lengthy record in the present case, and the full and complete opportunity that the town had to present its case. *Concerned Citizens of Sterling, Inc.* v. *Connecticut Siting Council*, 215 Conn. 474, 489, 576 A.2d 510 (1990) ("The Council made voluminous detailed findings about the facility's likely effects on water and on the air. These findings consistently indicate that the facility, properly constructed in accordance with the Council's guidelines, would have no significant adverse environmental impact.").

The council concluded that there was sufficient showing of need for the granting of the application. The town contests these findings and conclusions, specifically stating that Cellco did not submit specific percentages of dropped calls. Under the substantial evidence test, there was sufficient evidence in the record for the council to conclude that the need requirement was met. Cellco introduced a document and expert testimony showing the percentage of dropped calls in the area of northwest Westport to be four times worse than the system average. The percentage of ineffective attempts (blocked calls) in this area likewise ranged between the system average and four times worse than the system average. This evidence on dropped calls in the record supports the council's conclusions.

The council also properly evaluated the issue of need as regards Springwich, Omnipoint, Sprint and Nextel. The council further found that the proposed site would improve coverage for Cellco and the other carriers. On this record, these findings must be accepted. *Nobs* v. *Connecticut Siting Council*, supra, Superior Court, Docket No. CV98-0492714S.

As indicated previously, the council must determine whether there are environmental impacts in locating

the facility and whether such impacts justify denial of the issuance of a certificate by the council. General Statutes § 16-50p (a) (2) and (3). The town claims that the council's findings on the environmental impacts are flawed, especially because it relied on the testimony of Cellco's expert, Klein. The town charges that Klein could not describe his visit to Sunny Lane, was unaware of the term "waterways protection line," and had no knowledge of the wetlands map for the property. It points out that the town conservation officer was concerned that Cellco had not thoroughly studied the effects of the tower on the property.

It has been stated numerous times by our Supreme Court that it is the agency's role to evaluate the evidence before it and the trial court may not retry the matter in an administrative appeal. *Samperi* v. *Inland Wetlands Agency*, 226 Conn. 579, 588, 628 A.2d 1286 (1993). "The question is not whether the trial court would have reached the same conclusion, but whether the record before the agency supports the decision reached." (Internal quotation marks omitted.) *DeBeradinis* v. *Zoning Commission*, 228 Conn. 187, 198, 635 A.2d 1220 (1994). The council did have evidence before it indicating that Klein had studied the environmental impacts, including the effects on wetlands, even if he was unfamiliar with town regulations. The council in its order took into account environmental concerns in placing the tower at a distance from the brook and the wetlands.

In addition, the record included more than Cellco's submissions and Klein's testimony. It included an expert's report submitted by the Clinton Avenue residents at a town zoning hearing, and then later submitted by the town to the council, showing that the project would not affect the environment to any great degree. The council also made its own inspection of the premises. The cases have noted the significance of an agency

inspection on its determination. *Grimes* v. *Conservation Commission*, 243 Conn. 266, 277, 703 A.2d 101 (1997).

The council evaluated the environmental findings and decided that they did not require the denial of the certificate. ("[T]he need for the facility outweighs the environmental effects of the facility after a detailed analysis of the effects on scenic resources, land use, ecological resources, and human health.") The council also took into account, as seen in its opinion, that the alternative site, Clinton Avenue, was more likely to present environmental difficulties than Sunny Lane.

The town also appeals on the ground that the council did not take into account the effect of the location of the tower on real estate values at or around the approved site. Under § 16-50p, as quoted previously, the council is not obliged to take into account the status of property values directly. The council must make use of property values in connection with its analysis of the environmental, scenic, historical and recreational values. The council has more than adequately considered these topics.

The final claim of the town is that the council did not adequately consider the status of the private residence on the premises. Such consideration, however, may be made, when appropriate, under the continuing jurisdiction of the council. General Statutes § 16-50u. Under certain circumstances that need not be decided now, the house may well be subject to the joint jurisdiction of the town and the council.

The council had substantial evidence for the decision that it reached. As the Appellate Court stated in *Preston* v. *Connecticut Siting Council*, supra, 20 Conn. App. 490–91: "[The town's] arguments are not borne out by the record. The council found that the potential adverse impacts were ameliorated by the design and efficiency

of the facility, and the requirement that the facility meet other state laws and regulations prior to and during operation." Based upon the foregoing, the appeal of the town in Docket No. CV00-0501129S, is dismissed, and the appeal of Cellco in Docket No. CV00-0500547S, is sustained, as the board did not have jurisdiction to enter its July 27, 1999 order.

The town shall comply with the council's orders by supplying the appropriate legal documents sought by Cellco.[8]

---

[8] The council's condition number six intends that the recommendations of the town be observed by Cellco in the construction process. This is the avenue for town input, not through the enforcement of municipal zoning regulations.