******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# WOODBRIDGE NEWTON NEIGHBORHOOD ENVIRONMENTAL TRUST ET AL. *v.* CONNECTICUT SITING COUNCIL ET AL.
## (SC 20816)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Ecker, Alexander and Dannehy, Js.

*Syllabus*

The named plaintiff, a nonprofit association of homeowners in the town of
Woodbridge, appealed to the trial court from the decision of the named
defendant, the Connecticut Siting Council, which approved the applica-
tion of the defendant telecommunications company, C Co., for a certifi-
cate of environmental compatibility and public need in connection with
its proposed construction of a cell phone tower in the town. The plaintiff
had intervened in the administrative proceeding pursuant to statute
(§ 22a-19 (a) (1)), seeking to prevent unreasonable impacts to nearby
scenic resources and vistas. At the outset of each evidentiary hearing
before the council, the council stated that property values were not
included among the statutory (§ 16-50p (a) (3) (B)) criteria that are to
be considered in a certification proceeding when determining the nature
of the probable environmental impact of a proposed facility. C Co.
introduced documents and testimony in order to demonstrate that the
proposed tower satisfied its service objectives, namely, improving cell
coverage in certain portions of the town, but the plaintiff presented
conflicting testimony with respect to the placement of the tower and
its effect on that coverage. Specifically, the plaintiff's radio frequency
consultant concluded that the placement of the proposed tower would
not materially improve service in the area and opined that two alternative
locations would provide competitive coverage with less impact to resi-
dential neighborhoods. The council ultimately found that there was a
need for a new tower to provide necessary wireless coverage to an
underserved area, and it expressly rejected the plaintiff's contention
that certain alternative locations identified by the plaintiff's witness
would provide comparable coverage to the site proposed by C Co. The
plaintiff appealed from the council's decision to the trial court, which
dismissed the plaintiff's administrative appeal. The trial court concluded
that the council's decision was supported by substantial evidence and
was reasonable in view of the evidence and applicable law. The trial
court also observed that the council had heard and considered evidence
from nearby residents regarding their concerns of the proposed tower's
impact on property values and that the record was clear that the council
had sufficiently considered alternative locations for the tower but con-

cluded that the approved site was the most appropriate location. Thereafter, the plaintiff appealed from the trial court's judgment. *Held*:

1. There was no merit to the plaintiff's claim that the trial court improperly dismissed its administrative appeal on the ground that the council had improperly declined to consider the impact of the proposed tower on private property values:

a. The plaintiff had standing, as an intervenor under § 22a-19, to raise the claim that the council was required, pursuant to § 16-50p (a) (3) (B), to consider the impact of the proposed tower on property values:

The plaintiff raised a colorable claim that a proposed facility's adverse impact on property values is an unenumerated significant adverse effect that the council must consider in determining the nature of the probable environmental impact of the facility pursuant to § 16-50p (a) (3) (B) because, if the plaintiff's reading of that statute were correct, the council would have been required to consider a proposed facility's impact on property values, and such evidence would, therefore, have been relevant to a determination of whether the construction of the facility constituted conduct that has, or that was reasonably likely to have, the effect of unreasonably polluting, impairing or destroying the public trust in the air, water or other natural resources of the state for purposes of § 22a-19 (a) (1).

b. The plaintiff could not prevail on its claim that, pursuant to § 16-50p (a) (3) (B), the council was required, but improperly declined, to consider the proposed tower's impact on private property values:

The overarching objective of the certification inquiry under § 16-50p (a) (3) (B) is to discern the probable environmental impact of a proposed facility, to that end, the statute requires that the council consider every significant adverse effect, including, but not limited to, those expressly enumerated in the statute, and, because the legislature therefore contemplated the possibility that there may be unenumerated significant adverse effects that must be considered by the council, this court concluded that the council is required to consider an unenumerated significant adverse effect when it, like the enumerated effects, is relevant to the probable environmental impact of the facility or to the significant adverse effects enumerated in the statute.

Because there was no inherently obvious connection between a facility's adverse impact on property values and the probable environmental impact of the facility or the enumerated significant adverse effects, this court could not conclude that a facility's impact on property values would always be relevant to the council's inquiry pursuant to § 16-50p (a) (3) (B), property values are therefore not an unenumerated significant adverse effect that is required to be considered by the council, and the council's announcement at the start of each hearing that property values

are not among the statutory criteria to be considered was facially consistent with § 16-50p (a) (3) (B).

Accordingly, although the council could have considered the proposed tower's impact on property values if such evidence was relevant to either the tower's probable environmental impact or one of the significant adverse effects enumerated in § 16-50p (a) (3) (B), the plaintiff failed to argue that property values were relevant or to introduce any evidence that would have allowed the council to determine that such evidence was relevant to its decision concerning whether to grant C Co.'s application.

2. The plaintiff could not prevail on its claim that the council's decision was unsupported by substantial evidence, which was based on its assertion that the council had overlooked two alternative locations for the proposed tower:

The parties presented extensive testimony and documentary evidence about the extent and quality of wireless services that would result from the placement of a tower in each proposed location, including expert testimony from C Co.'s radio frequency engineer that placing a tower at the site proposed by C Co. would provide a greater degree of service and would do a better job of improving capacity at higher frequency ranges, and the council effectively credited that witness' testimony and discredited the testimony of the plaintiff's radio frequency consultant when it expressly concluded that C Co.'s proposed site would offer more coverage than the alternative sites proposed by the plaintiff.

Moreover, the council's conclusion that a tower at an alternative site proposed by the plaintiff would provide inadequate coverage logically foreclosed the plaintiff's assertions that the possibility of improving a previously existing police communications tower at another location should have been investigated further and that the State Historic Preservation Office may not have ultimately objected to the construction of a tower at the alternative location, and this court rejected the plaintiff's claim that the trial court and the council had overlooked and minimized certain evidence that justified locating the tower at certain alternative locations, as that claim was predicated on a misunderstanding of the nature of the substantial evidence inquiry.

Argued December 14, 2023—officially released July 5, 2024*

*Procedural History*

Appeal from the decision of the named defendant approving the application of the defendant Cellco Partnership, doing business as Verizon Wireless, LLC, for

* July 5, 2024, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

a certificate of environmental compatibility and public need for the construction, maintenance, and operation of a telecommunications facility, brought to the Superior Court in the judicial district of New Britain, where the court, *Cordani, J.*, granted the motion to intervene as a plaintiff filed by the town of Woodbridge; thereafter, the case was tried to the court, *Cordani, J.*; judgment dismissing the appeal, from which the named plaintiff appealed. *Affirmed.*

*Joseph P. Mortelliti*, for the appellant (named plaintiff).

*Robert L. Marconi*, assistant attorney general, with whom, on the brief, was *William Tong*, attorney general, for the appellee (named defendant).

*Linda L. Morkan*, with whom, on the brief, were *Kenneth C. Baldwin* and *Diana E. Neeves*, for the appellee (defendant Cellco Partnership, doing business as Verizon Wireless, LLC).

*Opinion*

DANNEHY, J. The present appeal relates to the proposed construction of a 100 foot tall cell phone tower (tower) on a residentially zoned parcel of real property located in the town of Woodbridge (town). The named plaintiff, Woodbridge Newton Neighborhood Environmental Trust,[1] claims that the trial court improperly dismissed its administrative appeal from the decision of the named defendant, the Connecticut Siting Council (council), grant-

---

[1] The town was granted permission to intervene as a plaintiff but has not participated in the present appeal. In the interest of simplicity, all references herein to the plaintiff are to Woodbridge Newton Neighborhood Environmental Trust.

The trial court also granted the council's motion to consolidate the present case with another administrative appeal from the council's decision. See *Greengarden* v. *Connecticut Siting Council*, Superior Court, judicial district of New Britain, Docket No. HHB-CV-22-6070713-S. The plaintiffs in that action did not appeal from the trial court's decision.

ing the application of the defendant Cellco Partnership (Cellco), doing business as Verizon Wireless, LLC, for a certificate of environmental compatibility and public need pursuant to the Public Utility Environmental Standards Act (act), General Statutes § 16-50g et seq. The plaintiff contends that (1) the council was statutorily required, but improperly declined, to weigh the impact of the proposed tower[2] and its associated equipment on private property values, and (2) the council's decision was unsupported by substantial evidence and, specifically, overlooked two particular alternative locations for the tower. Assuming without deciding that the first claim is preserved, we conclude that a facility's impact on property values is not an enumerated or unenumerated "significant adverse effect"; General Statutes § 16-50p (a) (3) (B); that must be considered by the council, and that the plaintiff failed to present any evidence to the council that would have allowed it to determine that such evidence was relevant to its decision whether to grant Cellco's application. As to the second claim, we conclude that the council's decision was supported by substantial evidence. Accordingly, we affirm the judgment of the trial court.

The following facts and procedural history are relevant to our consideration of the present appeal. Cellco provides wireless telecommunications services in and around the town through a series of twelve transmission facilities, all but two of which are located in adjoining municipalities.[3] The two cell phone towers located in the town are, in turn, both situated near the Wilbur

---

[2] "[T]elecommunications towers, including associated telecommunications equipment," are included within the definition of "facility" under the act. General Statutes § 16-50i (a) (6).

[3] These twelve facilities are comprised of a mix between traditional cell phone towers, a large rooftop array, a flagpole antenna, and a few small-cell sites affixed to roadside utility poles. Each facility is at least two miles away from the site of the proposed cell phone tower at issue in the present case.

Cross Parkway at the southern end of the town. Various customer complaints and an in-vehicle drive test led Cellco to conclude that these existing facilities, in light of their relative positions and capabilities, provided inadequate service to the northern portions of the town, "particularly along portions of Route 63 (Amity Road), Route 67 (Seymour Road) and Route 114 (Center Road) . . . ."

These deficiencies led Cellco to consider constructing a new cell phone tower in the area. After investigating twenty-five different locations over a period of approximately six years, Cellco applied to the council for the approval of a new 100 foot cell phone tower capable of transmitting a range of wireless frequencies[4] on a six acre parcel of residentially zoned property located in the town at 118 Newton Road.[5] Subsequently, the plaintiff filed an application with the council requesting to intervene in the administrative proceeding pursuant to General Statutes §§ 4-177a, 16-50n (b), and 22a-19. In that application, the plaintiff represented itself as a nonprofit, voluntary association comprised of real property owners "within the visual corridor" of the proposed tower, and stated that it was seeking to prevent unreasonable impacts to nearby "scenic resources

---

[4] The application indicated that Cellco "intend[ed] to deploy its 700 [megahertz], 850 [megahertz], 1900 [megahertz] and 2100 [megahertz] frequencies . . . ." Testimony contained in the record indicates that lower frequency waves, which travel farther than higher frequency waves, are generally used to ensure coverage. Higher frequency waves, which travel shorter distances, are generally used to improve network capacity.

[5] Cellco's application included a map depicting the location of these twenty-five alternative locations. That same map was eventually incorporated as part of the council's formal findings of fact. For the sake of convenience, we attach a reproduction of that map as an appendix to this opinion. We note that Cellco's proposed location, 118 Newton Road, is designated on the map with a red number 1. Route 67 is located to its north, Route 63 to its east, and Route 114 to its south. Another location relevant to the present appeal, a parcel located on Meetinghouse Lane, is designated on the map with a red number 6.

and . . . scenic vistas . . . .” The council granted the plaintiff’s request to intervene a few weeks later.

The council held four evidentiary hearings on Cellco’s application, one every month from July to October, 2021.[6] At the outset of the first hearing, the presiding officer remarked: “Please be advised that the council’s project evaluation criteria under the statute do not include the consideration of property values.” This same statement was, in substance, repeated at the start of each subsequent hearing.

Cellco introduced documents and testimony during these hearings in order to demonstrate that the proposed tower satisfied its service objectives. A radio frequency engineer employed by Verizon Wireless, LLC, Ziad Cheiban, testified that, although Cellco’s initial computer modeling had indicated that a 140 foot tower would be needed to provide adequate coverage along Route 67, a continuous wave drive test[7] subsequently demonstrated that a 100 foot tower would suffice.[8] At

---

[6] General Statutes § 16-50m authorizes both public comment sessions and evidentiary hearings before the council. Public comment sessions are held in the evenings for the convenience of the general public and are informal. General Statutes § 16-50m (a). The procedures governing evidentiary hearings before the council are set forth in §§ 16-50j-1 through 16-50j-96 of the Regulations of Connecticut State Agencies.

One public comment session and four evidentiary hearings were held in connection with the present case. As contemplated by the regulations governing evidentiary hearings before the council, at the four evidentiary hearings held in the present case, the plaintiff was represented by counsel and was allowed to file motions, introduce evidence, present witnesses, and conduct cross-examination. See Regs., Conn. State Agencies §§ 16-50j-22, 16-50j-22a and 16-50j-28.

[7] Testimony before the council indicates that continuous wave drive testing involves temporarily positioning transmission equipment through the use of a crane and measuring the strength of the resulting wireless signal at various locations on the ground with a vehicle mounted sensor. Cheiban testified that this form of testing is generally considered to be more accurate than computer generated modeling.

[8] Although this reduced height resulted in a 0.3 mile gap in service along Route 67, Cellco determined that this problem could be addressed through the use of a single utility pole mounted small-cell facility.

this reduced height, Cellco's experts estimated that approximately fifteen residences would have at least seasonal views of the proposed tower.

The plaintiff, in response, submitted reports and testimony from its own radio frequency consultant, David Maxson of Isotrope, LLC. Maxson concluded that the placement of the proposed tower on Newton Road would provide "no material improvement to service to and along [Route] 67," and assumed, as a result, that Cellco's original goal of providing service in that area had been "abandon[ed] . . . ." On the basis of this assumption, Maxson shifted his own analysis to two municipally owned properties located on Meetinghouse Lane, both of which were located near town hall, approximately one mile to the south of 118 Newton Road. According to Maxson, computer modeling and a continuous wave drive test demonstrated that these alternative locations would provide "competitive coverage with significantly less impact to residential neighborhoods." (Emphasis omitted.)

Cheiban disagreed with Maxson's conclusions. Cheiban emphasized the fact that Cellco's continuous wave drive test had demonstrated that a 100 foot tower on Newton Road would result in improved wireless services along Route 67.[9] Cheiban indicated that Maxson

---

[9] Specifically, Cheiban testified: "I think what [Maxson] is arguing in this report is that 118 Newton Road is not a good location. It basically does not meet the full coverage objective. . . . Meetinghouse Lane also does not meet the full coverage objective. Therefore, they're both equally bad. . . . And, my argument is . . . that, actually, that is not true. The [continuous wave drive] test, the measurement that we did, shows that 118 Newton Road provides significantly more coverage than . . . Meetinghouse Lane, and is actually an acceptable site."

Cheiban further testified that, although it theoretically would be feasible to supplement a tower on Meetinghouse Lane with a series of multiple utility pole mounted small-cell facilities along Route 67, Cellco had previously struggled to locate usable utility poles in the area. Even if locations could be found, Cheiban indicated, small-cell sites are less reliable, on balance, because they are not supported with backup power. Thus, Cheiban stated, "in my opinion, if we were . . . for the sake of argument, to go [with] . . .

had focused his analysis too narrowly on lower frequencies and that, because the plaintiff's alternatives were both situated approximately one mile south of 118 Newton Road, those alternatives "would not get the coverage we need for the higher frequencies" in areas located further to the north. Cheiban testified that centrally locating the tower on Newton Road, as proposed, would improve network capacity by splitting data traffic between different frequencies in a process known as carrier aggregation.[10]

On the same day as its first evidentiary hearing, the council also held a separate hearing to receive public comments. Before the floor was opened to speakers, the presiding officer repeated: "Please be advised that the council's project evaluation criteria under the statute do not include consideration of property values." Notwithstanding this admonition, many members of the public did, in fact, comment on the proposal's impact on property values. Most notably, a real estate agent from the town stated that the proposed location "borders some of [the town's] highest priced neighborhoods" and expressed her opinion that those homes would need to be priced lower in order to sell in the event that the cell phone tower was constructed. The record contains no indication that the council prohibited anyone from speaking, or that Cellco ever sought to strike any of these comments from the record.

4 Meetinghouse Lane, we'd be back in front of the council asking for another tower roughly in that same area."

[10] At the hearing, another witness called by Cellco, Brian Gaudet, testified that some of the buildings located along Meetinghouse Lane were listed on the National Register of Historic Places, and that the placement of a large tower in the area "would not go over well with the [State Historic Preservation Office]." The plaintiff subsequently objected to this concern as being speculative. The council's ultimate decision did not, however, discuss the possibility of rejection by the State Historic Preservation Office in weighing the plaintiff's proposed alternative locations.

The council released its formal findings of fact on December 16, 2021.[11] On the basis of the evidence presented to it, the council found the following facts related to both existing services and the capabilities of the proposed tower: (1) "Cellco currently has a significant reliable wireless service deficiency in its communications network in the northern section of Woodbridge, particularly in the Route 63, Route 67, Route 114, Newton Road, and Prospect Hill areas"; (2) "Cellco conducted [a continuous wave drive] test to confirm the proposed site would provide reliable in-vehicle service to the Route 67 [and] Route 63 intersection area, given the reduced tower height, [Cellco's continuous wave drive] test . . . indicated that Route 63 has adequate coverage to Apple Tree Lane north of the intersection, [and] Route 67 west of the intersection is partially covered, [as] an approximate 0.3 mile coverage gap would occur between Rock Hill Road and [Maple Vale] Drive"; and (3) "[a] potential small cell would be able to serve the coverage gap along Route 67 . . . ." See footnote 8 of this opinion.

The council's factual findings directly addressed one of the plaintiff's central contentions, namely, that a tower placed at either of the proposed alternative locations on Meetinghouse Lane would provide coverage comparable to a tower on Newton Road. The council expressly rejected that conclusion on the basis of the evidence presented: "Cellco's proposed site would offer more coverage to the proposed service area than a site at Meetinghouse Lane because Meetinghouse Lane is at a much lower elevation (approximately 130 feet

---

[11] The council's findings contained the following proviso related to the consideration of property values: "The [c]ouncil's project evaluation criteria under . . . § 16-50p [do] not include the consideration of property values; nor is the [c]ouncil otherwise obligated to take into account the status of property values." In support of this proposition, the council cited *Westport* v. *Connecticut Siting Council*, 47 Conn. Supp. 382, 797 A.2d 655 (2001), aff'd, 260 Conn. 266, 796 A.2d 510 (2002).

lower) and 0.9 miles south of the proposed site. Additionally, the proposed site is near the center of the coverage need area, whereas the Meetinghouse Lane area is on the southern periphery of the coverage need area."[12] The council's findings continued: "The proposed site allows for the even distribution of network traffic among three antenna sectors. The Meetinghouse Lane area is at the edge of the proposed service area and would not be able to effectively deploy three antenna sectors and therefore would not be effective from a site capacity standpoint."

The council's formal opinion, which was released on the same date as its final findings of fact, reached the following conclusions: "After considering the record in this matter, the [c]ouncil finds a need for a new tower to provide necessary wireless coverage to an underserved area. The [c]ouncil notes that the tower height has already been reduced from 140 feet to 100 feet during the pre-application municipal consultation. Although the reduction in tower height does cause a small area of unreliable service on Route 67, Cellco intends to install a small cell in the future to fill in this small gap. The [c]ouncil finds that a [tower] in the Meetinghouse Lane area, as suggested by [the plaintiff], is too far south and too low in elevation to achieve reliable service in the Route 63 and Route 67 area . . . ."

The council then concluded, consistent with its obligations under § 22a-19 (b), that "the proposal would not cause unreasonable pollution, impairment or destruction of the public trust in the air, water or other natural resources of the state." The council continued: "The [c]ouncil has considered all reasonable alternatives and

---

[12] More specifically, the council observed that the plaintiff's own continuous wave drive test for a 150 foot cell phone tower located at 15 Meetinghouse Lane would fail to provide reliable in-vehicle "[c]overage on Route 67 west of the intersection," and that multiple utility pole mounted small cells would be required to correct for that deficiency.

finds that the proposal represents the best alternative consistent with the reasonable requirements of the public health, safety and welfare." Finally, the council concluded, as required by § 16-50p (a) (3), that "the effects associated with the construction, operation, and maintenance of the [tower] at the proposed site in the proposed location, including effects on the natural environment, ecological balance, public health and safety, scenic, historic, and recreational values, agriculture, forests and parks, air and water purity, and fish, aquaculture and wildlife are not disproportionate either alone or cumulatively with other effects when compared to need, are not in conflict with policies of the [s]tate concerning such effects, and are not sufficient reason to deny [the] application."

The plaintiff appealed from the council's decision to the trial court pursuant to the Uniform Administrative Procedure Act (UAPA), General Statutes § 4-183. After a hearing, the trial court issued a decision addressing several procedural and substantive claims. Although the trial court recognized that "opposition to the . . . council's final decision . . . appears to be broad and deeply held," the court noted that "it was the . . . council's province to make the required balance and [the] court's responsibility . . . to review the record to ensure that substantial evidence supports the . . . council's findings of fact and that the . . . council's conclusions are reasonable in view of the findings of fact and the applicable law."

Concerning the question of property values, the trial court observed: "[T]he . . . council heard evidence from nearby residents regarding their concerns of the [tower's] impact on property values. Although no expert evidence was offered in this regard, property owners are capable of testifying regarding their perception of the value of their own property. The . . . council heard and considered this evidence. The [plaintiff has] not

pointed to any specific evidence [that it] offered but [that] the . . . council refused to receive into evidence. The . . . council also understood the number and closeness of residences to the site. . . . The . . . council also understood the impact on the property surrounding the site and its views." (Citation omitted.)

The trial court likewise considered, and rejected, the plaintiff's claim that the council had conducted an insufficient investigation into the proposed alternative locations on Meetinghouse Lane. On that point, the trial court found that the record was "crystal clear" that the council had "considered other potential locations . . . but concluded that the approved site was the most appropriate location. The . . . council provided specific reasons for rejecting the most prevalent alternat[ive] locations . . . [on] Meetinghouse Lane, in finding that the alternat[ive] locations were lower in elevation, would not provide the signal coverage sought and needed, and were functionally less desirable than the approved site." The trial court concluded: "Although the record certainly contains evidence [that] could have reasonably supported a decision to locate the [tower] at locations other than the approved site, namely, the Meetinghouse Lane locations, this is not the applicable test on appeal. The test is whether the . . . council's decision is supported by substantial evidence and is reasonable in view of the evidence and applicable law. [The] court finds that it is." (Footnote omitted.) On the basis of that conclusion, the trial court dismissed the plaintiff's administrative appeal.[13] This appeal followed.[14]

[13] The trial court also concluded that the plaintiff was both statutorily and classically aggrieved, and rejected the plaintiff's claims that (1) defective notice provided by the council violated the plaintiff's due process rights and deprived the council of jurisdiction, and (2) the statutory funding arrangement of the council deprived the plaintiff of due process. Those rulings are not at issue in this appeal.

[14] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and this court transferred the appeal to itself pursuant to General

## I

The plaintiff first claims that the trial court should have sustained its appeal on the ground that the council improperly had declined to consider the tower's impact on private property values. More specifically, the plaintiff argues that the council was required, pursuant to § 16-50p (a) (3) (B), to consider the proposed tower's impact on property values and declined to do so. In response, Cellco contends that, as an intervenor pursuant to § 22a-19, the plaintiff lacks standing to assert this claim. In addition, both defendants argue that the claim is unpreserved and also contend that, even if the plaintiff has standing to assert the claim and properly preserved it, § 16-50p (a) (3) (B) does not require the consideration of a facility's impact on private property values. We conclude that the plaintiff has standing to raise the issue of a facility's impact on property values. Assuming without deciding that the plaintiff preserved its claim that the council was statutorily required to consider such impact and failed to do so, we conclude that a facility's impact on property values is not an enumerated or unenumerated significant adverse effect required to be considered by the council in approving an application. We further conclude that, although the council may consider a facility's impact on property values when such evidence is relevant, either generally to the probable environmental impact of the facility or, more specifically, to one of the significant adverse effects listed in § 16-50p (a) (3) (B), the plaintiff made no such showing in the evidentiary hearings. Accordingly, under the present record, we conclude that the plaintiff failed to establish that the council was required, pursuant to § 16-50p (a) (3) (B), to consider the proposed tower's impact on property values.

Statutes § 51-199 (c) and Practice Book § 65-1.

A

Because it implicates this court's subject matter jurisdiction, we first address Cellco's claim that the plaintiff lacks standing to raise the issue of property values. Cellco contends that, with the exception of claims alleging a denial of fundamental fairness in the proceedings, a party granted intervenor status pursuant to § 22a-19 in an agency proceeding has standing only to raise environmental issues. The plaintiff responds that evidence regarding a facility's impact on property values can be relevant to the council's inquiry pursuant to § 16-50p (a) (3) (B), by illustrating and quantifying the facility's impact on the environment or on the expressly listed significant adverse effects. We conclude that the plaintiff has standing to raise this claim.

Section 22a-19 (a) (1) provides in relevant part: "[A]ny person, partnership, corporation, association, organization or other legal entity may intervene as a party on the filing of a verified pleading asserting that the proceeding or action for judicial review involves conduct which has, or which is reasonably likely to have, the effect of unreasonably polluting, impairing or destroying the public trust in the air, water or other natural resources of the state."

"This court repeatedly has held that a person who intervenes in an administrative proceeding pursuant to § 22a-19, and who is aggrieved by the agency's decision, is entitled to appeal from that decision pursuant to the statutory provisions governing appeals from the decisions of that particular agency. . . . An intervenor pursuant to § 22a-19 has standing to bring an appeal from an agency's decision only to protect the natural resources of the state from pollution or destruction. . . . Although a plaintiff seeking to assert a claim under § [22a-19] need not prove [its] case in order to survive a motion to dismiss, [it] nevertheless must articulate a

colorable claim of unreasonable pollution, impairment or destruction of the environment." (Citations omitted; internal quotation marks omitted.) *Not Another Power Plant* v. *Connecticut Siting Council*, 340 Conn. 762, 775–76, 265 A.3d 900 (2021). As we explained in *FairwindCT, Inc.* v. *Connecticut Siting Council*, 313 Conn. 669, 99 A.3d 1038 (2014), "all that is required to invoke the jurisdiction of the Superior Court [and this court] under [the Connecticut Environmental Protection Act of 1971 (CEPA), General Statutes § 22a-14 et seq.] is a colorable claim, by any person [or entity] against any person [or entity], of conduct resulting in harm to one or more of the natural resources of this state." (Internal quotation marks omitted.) Id., 712.

The premise underlying Cellco's challenge to the plaintiff's standing is that a facility's impact on property values is not an enumerated or unenumerated "significant adverse effect" that the council must consider in determining the "nature of the probable environmental impact of the facility . . . ." General Statutes § 16-50p (a) (3) (B). This is the very issue that the plaintiff asks us to resolve in this appeal. Although we conclude, as we explain herein, that the plaintiff's claim fails on the merits, the plaintiff nonetheless raises a colorable claim that a facility's adverse impact on property values is an unenumerated significant adverse effect for purposes of § 16-50p (a) (3) (B). If the plaintiff were correct in its reading of § 16-50p (a) (3) (B), the council would be required to consider a facility's impact on property values, and such evidence would be relevant to a determination of whether a proposed facility constitutes "conduct which has, or which is reasonably likely to have, the effect of unreasonably polluting, impairing or destroying the public trust in the air, water or other natural resources of the state." General Statutes § 22a-19 (a) (1). Accordingly, because the plaintiff has presented a colorable claim that a facility's impact on prop-

erty values is an implicit significant adverse effect for purposes of § 16-50p (a) (3) (B), the plaintiff has standing, as a § 22a-19 intervenor, to assert this claim.[15]

B

We next consider the plaintiff's claim that the council was statutorily required to consider the proposed tower's impact on property values. The plaintiff contends that both the plain language of the statute and the decision in *Westport* v. *Connecticut Siting Council*, 47 Conn. Supp. 382, 797 A.2d 655 (2001), which was affirmed and adopted by this court; *Westport* v. *Connecticut Siting Council*, 260 Conn. 266, 274, 796 A.2d 510 (2002); demonstrate that the council is obligated, pursuant to § 16-50p (a) (3) (B), to consider a facility's impact on property values. We disagree and conclude that a facility's impact on property values is not an enumerated or an unenumerated significant adverse effect. And, although the council may consider a facility's impact on property values when such evidence is relevant either to the facility's probable environmental impact or to one of the significant adverse effects enumerated in § 16-50p (a) (3) (B), the plaintiff failed to argue that property values were relevant or to introduce any evidence that would have allowed the council to so conclude.

Whether the council was required to consider, pursuant to § 16-50p (a) (3) (B), the tower's impact on property values presents a question of statutory interpretation, subject to plenary review and guided by established

---

[15] The trial court concluded that the plaintiff was not only statutorily, but also classically, aggrieved. See footnote 13 of this opinion. As we observed previously in this opinion, no party has challenged that ruling in this appeal. Because we conclude that the plaintiff has standing pursuant to § 22a-19 to claim that the council was required to consider the tower's impact on property values, we need not consider whether the trial court correctly concluded that the plaintiff also was classically aggrieved.

principles for discerning legislative intent. See, e.g., *Fay* v. *Merrill*, 336 Conn. 432, 446, 246 A.3d 970 (2020) (describing plain meaning rule, as set forth in General Statutes § 1-2z, and principles for discerning legislative intent).

We begin with the relevant statutory language. Section 16-50p (a) (3) provides in relevant part: "The council shall not grant a certificate, either as proposed or as modified by the council, unless it shall find and determine . . . (B) The nature of the probable environmental impact of the facility alone and cumulatively with other existing facilities, including a specification of every significant adverse effect, including, but not limited to, (i) electromagnetic fields that, whether alone or cumulatively with other effects, impact on, and conflict with the policies of the state concerning the natural environment, (ii) ecological balance, (iii) public health and safety, (iv) scenic, historic and recreational values, (v) agriculture, (vi) forests and parks, (vii) air and water purity, and (viii) fish, aquaculture and wildlife . . . ."[16]

The statutory language identifies the overarching objective of the inquiry, namely, to discern the "probable environmental impact" of the facility. General Statutes § 16-50p (a) (3) (B). In order to arrive at that assessment, the council must consider "every significant adverse effect," including, but not limited to, those expressly listed in the statute. General Statutes § 16-50p (a) (3) (B). The "significant adverse effect[s]" listed in the statute, therefore, are effects that the legislature has identified as both relevant and necessary to the council's overarching inquiry into the nature of the facility's probable environmental impact, which is a condi-

[16] In addition, § 16-50p (b) (1) provides in relevant part that the council "may deny an application for a certificate if it determines that . . . (iii) the proposed facility would substantially affect the scenic quality of its location or surrounding neighborhood and no public safety concerns require that the proposed facility be constructed in such a location . . . ."

tion precedent to the council's approval of the application.[17] See General Statutes § 16-50p (a) (3) (C) (requiring council's decision to explain "[w]hy the adverse effects or conflicts referred to in subparagraph (B) of this subdivision are not sufficient reason to deny the application"). Section 16-50p (a) (3) (B) does not list a facility's impact on property values as a significant adverse effect required to be considered by the council.[18] The statute makes clear, however, that the list

[17] The listed significant adverse effects to be considered support this conclusion, as all of them bear some connection to environmental concerns. The first factor, "electromagnetic fields," is qualified by specifying that this concern is limited to those electromagnetic fields that impact and conflict with the state's policies concerning the natural environment. General Statutes § 16-50p (a) (3) (B) (i). The second factor, "ecological balance," requires the council to undertake a broad review of the environmental impact of the facility. General Statutes § 16-50p (a) (3) (B) (ii). The next three factors, public health and safety, scenic, historic and recreational values, and agriculture, all involve issues closely related to and affected by the environmental impact of a facility. General Statutes § 16-50p (a) (3) (B) (iii) through (v). This court has, in fact, specifically recognized the close connection between public health and safety, historical values, and the environment. See, e.g., *Smith* v. *Zoning Board of Appeals*, 227 Conn. 71, 84–85, 629 A.2d 1089 (1993) (reasoning that town planning and zoning commission had authority to promulgate regulations on basis of historical factors, despite absence of express reference to such factors in town charter, due to close relationship of historic preservation to enumerated factor in town charter of public health and safety, and explaining that "public health and safety includes protecting the environment, which, in turn, includes historic preservation"), cert. denied, 510 U.S. 1164, 114 S. Ct. 1190, 127 L. Ed. 2d 540 (1994). The final three enumerated factors, forests and parks, air and water purity, and fish, aquaculture and wildlife, are all specific aspects of the environment. General Statutes § 16-50p (a) (3) (B) (vi) through (viii).

[18] By contrast, CEPA, which, like the act, deals with the subject of the environment, expressly identifies economic impact as one of the factors that a state agency must consider, as part of its environmental impact evaluation pursuant to CEPA, for "actions [that] may significantly affect the environment . . . ." General Statutes § 22a-1b (c); see also General Statutes § 22a-1b (c) (6) (listing as one factor that must be included in evaluation "an analysis of the short term and long term economic, social and environmental costs and benefits of the proposed action"). The inclusion of economic impact as an express statutory factor that must be considered pursuant to CEPA, coupled with the failure to list a similar economic factor to be considered by the council in applying § 16-50p (a) (3) (B), supports

is not exclusive, because it provides that significant adverse effects "includ[e], but [are] not limited to," the expressly listed factors. General Statutes § 16-50p (a) (3) (B). Accordingly, the legislature has not ruled out the possibility that there may be unenumerated, significant adverse effects that must be considered by the council. Applying the principle of ejusdem generis, we conclude that, like the listed effects, any such unenumerated significant adverse effect must also be relevant to the probable environmental impact of the facility. See, e.g., *Balloli* v. *New Haven Police Dept.*, 324 Conn. 14, 23, 151 A.3d 367 (2016) ("According to the [doctrine] of ejusdem generis, unless a contrary intent appears, [when] general terms are followed by specific terms in a statute, the general terms will be construed to embrace things of the same general kind or character as those specifically enumerated. 2A J. Sutherland, Statutory Construction (4th Ed. Sands [1986]) § 47.17." (Internal quotation marks omitted.)).

Our reading of the statute, that it limits the significant adverse effects required to be considered by the council to those that are relevant to the probable environmental impact of the facility, finds further support in the statutory scheme of which § 16-50p (a) (3) (B) is a part, namely, the act. General Statutes § 16-50g sets forth the legislative purpose of the act: "To provide for the balancing of the need for adequate and reliable public utility services at the lowest reasonable cost to consumers with the need to protect the environment and ecology of the state and to minimize damage to scenic, historic, and recreational values; to provide environmental quality standards and criteria for the location,

our conclusion that a proposed facility's impact on property values is not a statutory factor under § 16-50p (a) (3) (B). See, e.g., *State* v. *Cody M.*, 337 Conn. 92, 103, 259 A.3d 576 (2020) ("[when] a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject . . . is significant to show that a different intention existed" (internal quotation marks omitted)).

design, construction and operation of facilities for the furnishing of public utility services at least as stringent as the federal environmental quality standards and criteria, and technically sufficient to assure the welfare and protection of the people of the state; to encourage research to develop new and improved methods of generating, storing and transmitting electricity and fuel and of transmitting and receiving television and telecommunications with minimal damage to the environment and other values described above; to promote energy security; to promote the sharing of towers for fair consideration wherever technically, legally, environmentally and economically feasible to avoid the unnecessary proliferation of towers in the state particularly where installation of such towers would adversely impact class I and II watershed lands, and aquifers; to require annual forecasts of the demand for electric power, together with identification and advance planning of the facilities needed to supply that demand and to facilitate local, regional, state-wide and interstate planning to implement the foregoing purposes." As this statement makes clear, the primary purpose of the act is to ensure that the council balances the public need against environmental impact. Section 16-50p (a) (3) (A) addresses one element of the council's balancing task under the act, requiring the council to find and determine "a public need for the facility and the basis of the need . . . ." Section 16-50p (a) (3) (B), the provision at issue in the present appeal, addresses the second element, the probable environmental impact.

There is no inherently obvious connection between a facility's adverse impact on property values and the probable environmental impact of the facility or the listed significant adverse effects. We cannot conclude, therefore, that a facility's impact on property values will always be relevant to the council's inquiry pursuant to § 16-50p (a) (3) (B), and, accordingly, it is an unenu-

merated significant adverse effect required to be considered by the council.[19] We thus conclude that the council's announcement at the start of each evidentiary hearing, "[p]lease be advised that the council's project evaluation criteria under the statute do not include consideration of property values," is facially consistent with § 16-50p (a) (3) (B). That statement merely proclaims that a facility's impact on property values is not one of the statutory "criteria," or one of the significant adverse effects, a proposition with which we agree.

Our conclusion that a facility's financial impact on private property values is not a significant adverse effect that the council must consider in determining whether to grant an application does not mean that the council may never consider such evidence. Under the UAPA, the council has broad discretion in admitting evidence. General Statutes § 4-178 provides in relevant part that, "[i]n contested cases . . . (1) [a]ny oral or documentary evidence may be received, but the agency shall, as a matter of policy, provide for the exclusion of irrelevant, immaterial or unduly repetitious evidence

[19] We find unpersuasive the plaintiff's contention that, because a facility's impact on property values is relevant to determining whether a party is classically aggrieved, the council must consider such impact in making its determination pursuant to § 16-50p (a) (3) (B). Classical aggrievement is part of the common-law standing inquiry and "requires a two part showing. First, a party must demonstrate a specific, personal and legal interest in the subject matter of the [controversy], as opposed to a general interest that all members of the community share. . . . Second, the party must also show that the [alleged conduct] has specially and injuriously affected that specific personal or legal interest." (Internal quotation marks omitted.) *Trikona Advisers Ltd.* v. *Haida Investments Ltd.*, 318 Conn. 476, 485, 122 A.3d 242 (2015). The plaintiff has offered no explanation as to why the inquiry for common-law classical aggrievement should inform our statutory construction of § 16-50p (a) (3) (B), and we perceive no discernible connection.

Another argument advanced by the plaintiff, that the council's "refusal to consider property values" runs contrary to the standards embraced in other jurisdictions, merits little discussion. None of the decisions relied on by the plaintiff involves the application of statutes with similar language to that employed in § 16-50p (a) (3) (B).

. . . ." Upon a proper showing that a facility's adverse impact on property values is relevant to the council's determination of a facility's probable environmental impact, or to one of the significant adverse effects enumerated in § 16-50p (a) (3) (B), therefore, such evidence should be considered by the council.[20]

We find unpersuasive the plaintiff's reliance on *Westport* v. *Connecticut Siting Council*, supra, 47 Conn. Supp. 382, which, as we previously mentioned, was adopted by this court in *Westport* v. *Connecticut Siting Council*, supra, 260 Conn. 274. In that case, the town of Westport challenged the council's granting of a certificate of environmental compatibility and public need relating to the construction of a telecommunications facility within its borders. *Westport* v. *Connecticut Siting Council*, supra, 47 Conn. Supp. 383–84. Westport argued, among other things, that the council had failed to "take into account the effect of the location of the tower on real estate values at or around the approved site." Id., 407. In addressing this argument, the trial court concluded that "the council is not obliged to take into account the status of property values directly" but that it must, nonetheless, "make use of property values in connection with its analysis of the environmental, scenic, historical and recreational values." Id. Finding that the council had adequately considered that topic,

_____

[20] Indeed, on appeal, the plaintiff argues that evidence of a facility's impact on property values is relevant because it illustrates and quantifies a facility's environmental impact generally, and/or its adverse effect on scenic and recreational values. The plaintiff failed to advance this argument to the council or to make an offer of proof as to how a facility's impact on property values was relevant to the council's determination of the probable environmental impact generally, or to one of the significant adverse effects listed in § 16-50p (a) (3) (B). Indeed, after four months of evidentiary hearings, the plaintiff had not sought to establish—through either testimony or documentary evidence—that declines in private property values could meaningfully assist the council in evaluating the environmental impacts of Cellco's proposal.

the trial court dismissed Westport's administrative appeal. Id., 407–408.

On appeal to this court, Westport raised claims pertaining to aggrievement, the council's exclusive jurisdiction and certain claimed procedural improprieties. *Westport* v. *Connecticut Siting Council*, supra, 260 Conn. 274. Westport did not challenge on appeal the trial court's conclusion that the council had adequately considered any impact of the facility on property values. Thus, that issue was not before this court on appeal. See id. Accordingly, the trial court's language in *Westport* discussing the consideration of a facility's impact on property values is dictum.

The plaintiff relies on that dictum in *Westport* to argue that this court has held that the council is statutorily required to consider a facility's impact on property values in determining whether to grant an application pursuant to § 16-50p (a) (3) (B). The relevant language in the trial court's decision in *Westport* states: "Under § 16-50p . . . the council is not obliged to take into account the status of property values directly," but it must, nonetheless, "make use of property values in connection with its analysis of the environmental, scenic, historical and recreational values." *Westport* v. *Connecticut Siting Council*, supra, 47 Conn. Supp. 407. Not only is this language dictum, but it also is a broad, conclusory statement without any explanation as to how that conclusion is supported by the statutory language. Specifically, the statement suggests that the council must consider property values in evaluating the significant adverse effects listed in § 16-50p (a) (3) (B). But the dictum offers no statutory analysis in support of the conclusion that the legislature intended such a requirement. To the contrary, as we stated previously in this opinion, we conclude that, although the council is not required under § 16-50p (a) (3) (B) to consider a facility's impact on property values, if the council deter-

mines, pursuant to § 4-178 (1), that a proponent has demonstrated that such evidence is relevant to the council's consideration of the probable environmental impact of a facility or to the significant adverse effects listed in § 16-50p (a) (3) (B), the council should consider it.

## II

The plaintiff's second claim is that the council's decision was unsupported by substantial evidence and, specifically, that it failed to adequately consider the two alternative locations it proposed along Meetinghouse Lane. The defendants disagree, citing extensive testimony and evidence related to the need for additional cellular coverage in the area, computer modeling and field testing demonstrating the range of the tower proposed, the feasibility of using the plaintiff's suggested locations on Meetinghouse Lane, and the visual impacts likely to result from the various proposals. We agree with the defendants.

We first set forth the standard of review. "Judicial review of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. . . . This so-called substantial evidence rule is similar to the sufficiency of the evidence standard applied in judicial review of jury verdicts, and evidence is sufficient to sustain an agency finding if it affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . [I]t imposes an important limitation on the power of the courts to overturn a decision of an administrative agency . . . and [provides] a more restrictive standard of review than standards embodying review of weight of the evidence or clearly erroneous action. . . . [T]he possibility of drawing two

inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. . . . [T]he credibility of witnesses and the determination of factual issues are matters within the province of the administrative agency. . . . As with any administrative appeal, our role is not to reexamine the evidence presented to the council or to substitute our judgment for the agency's expertise, but, rather, to determine whether there was substantial evidence to support its conclusions." (Citations omitted; internal quotation marks omitted.) *FairwindCT, Inc.* v. *Connecticut Siting Council*, supra, 313 Conn. 689–90. "The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are . . . (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. . . ." General Statutes § 4-183 (j); see also *Not Another Power Plant* v. *Connecticut Siting Council*, supra, 340 Conn. 778–79; *Connecticut Coalition Against Millstone* v. *Connecticut Siting Council*, 286 Conn. 57, 68, 942 A.2d 345 (2008).

The plaintiff's arguments on this point are almost entirely premised on Maxson's conclusion that a tower located on Meetinghouse Lane would provide a "comparable" degree of coverage to a tower proposed at 118 Newton Road. The standard of review applicable to UAPA administrative appeals compels a firm rejection of that premise. During the evidentiary hearings before the council, the parties presented extensive testimony and documentary evidence about the extent and quality of wireless services that would be provided by the placement of a cell phone tower in each of these three locations. That evidence included not only computer modeling but also continuous wave drive tests from both Newton Road and Meetinghouse Lane. Cellco's

expert witness, Cheiban, testified that placing a tower on Newton Road would provide a greater degree of service along Route 67 and would do a better job of improving capacity at higher frequency ranges.

As we stated previously in this opinion, in its formal findings of fact, the council expressly concluded that "Cellco's proposed site would offer more coverage to the proposed service area than a site at Meetinghouse Lane because Meetinghouse Lane is at a much lower elevation (approximately 130 feet lower) and 0.9 miles south of the proposed site." In so doing, the council effectively credited Cheiban's testimony and discredited Maxson's testimony. Our courts are not at liberty to revisit that conclusion. See, e.g., *FairwindCT, Inc.* v. *Connecticut Siting Council*, supra, 313 Conn. 689–90 ("[T]he credibility of witnesses and the determination of factual issues are matters within the province of the administrative agency. . . . [O]ur role is not to reexamine the evidence presented to the council or to substitute our judgment for the agency's expertise, but, rather, to determine whether there was substantial evidence to support its conclusions." (Citation omitted; internal quotation marks omitted.)).

The plaintiff's remaining arguments warrant little discussion. The council's factual conclusion that a tower located on Meetinghouse Lane would provide inadequate coverage logically forecloses the plaintiff's separate assertions that (1) the possibility of utilizing or improving a previously existing 90 foot police communications tower on 4 Meetinghouse Lane should have been investigated further, and (2) the State Historic Preservation Office may not have ultimately objected to the construction of a tower on Meetinghouse Lane. See footnote 10 of this opinion. The record demonstrates that the council had before it not only Cellco's computer modeling but also the plaintiff's own field testing from that location. Finally, the plaintiff claims

that the trial court and the council "overlooked and minimized substantial evidence that justified locating the [tower] at 4 Meetinghouse Lane or 15 Meetinghouse Lane." This claim is predicated on a misunderstanding of the nature of the substantial evidence inquiry. The question is not whether the evidence would also support a different, or even inconsistent conclusion but whether there is substantial evidence to support the council's decision; see *FairwindCT, Inc.* v. *Connecticut Siting Council*, supra, 313 Conn. 689; and we have concluded that there is.

The judgment is affirmed.

In this opinion the other justices concurred.

APPENDIX

Figure 6 – Site Search Summary Map

